IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 29, 2019

**STATE OF TENNESSEE v. NATHAN G. FLEMING**

**Appeal from the Criminal Court for Knox County**
**No. 103206   Bobby R. McGee, Judge**

_____

**No. E2019-00078-CCA-R3-CD**

_____

A jury convicted the Defendant, Nathan G. Fleming, of two counts of aggravated robbery, two counts of attempted first degree murder, four counts of employing a firearm during the commission of a dangerous felony, two counts of carjacking, and two counts of especially aggravated robbery.  The trial court merged various convictions and imposed an effective sentence of sixty-eight years.  On appeal, the Defendant challenges the sufficiency of the evidence supporting his convictions and the trial court's imposition of partial consecutive sentences.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

J. Liddell Kirk (on appeal) and R. Alexander Brown (at trial), Knoxville, Tennessee, for the appellant, Nathan G. Fleming.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

The evidence presented at trial established that on December 26, 2013, the Defendant arrange to purchase marijuana at the home of Mr. Derek Marsh and Mr. James Daniels.  Instead, the Defendant produced a gun, held Mr. Marsh at gunpoint, and took

Mr. Marsh's gun from him. During the course of the robbery, Mr. Marsh was able to escape, but the Defendant shot Mr. Daniels multiple times. When the Defendant left the home, he approached Mr. Mateo Gaspar, who was in his SUV, shot Mr. Gaspar twice, and drove away in the SUV.

Mr. Daniels testified that he, Mr. Marsh, Mr. Rocky Carson, and Mr. Brandon Coleman were inside the home when the Defendant initially produced the gun. Mr. Daniels had learned earlier in the day that the Defendant and Mr. Carson were coming to the home, and Mr. Daniels believed that the Defendant and Mr. Marsh were going to purchase marijuana from Mr. Carson. Mr. Daniels said that the Defendant arrived in a white or gray car, that multiple people were inside the car, and that the Defendant was sitting in the backseat. The car parked in a space behind the home, and the Defendant entered through the back door. He sat on the couch in the living room where he and Mr. Daniels talked for five to fifteen minutes until Mr. Marsh, Mr. Coleman, and Mr. Carson arrived.

After everyone arrived, the Defendant went outside, stating that he needed to get money from his brother, who was in the car. When he returned, Mr. Daniels and Mr. Carson were in the living room; Mr. Coleman was using the computer; and Mr. Marsh, who had a gun on his hip, was in the kitchen and near the back door. Mr. Carson had a container of marijuana and scales on a table in the living room and additional marijuana on his person.

Mr. Daniels testified that the Defendant reentered the home with a gun and "rack[ed]" the gun. Mr. Coleman and Mr. Carson ran out of the house through the front door. Mr. Daniels said he was about to flee when he realized that Mr. Marsh was still in the kitchen. Mr. Daniels took a pocket knife out of his pocket and walked toward the kitchen. He walked around a corner where he saw Mr. Marsh with his hands up. The Defendant was holding a gun to the back of Mr. Marsh's head, and it appeared as if the Defendant was pushing Mr. Marsh with the gun. Mr. Daniels realized that he would be unable to stop the Defendant with a pocket knife, and he dropped the knife and put his hands up.

Mr. Daniels stated that the Defendant pushed the gun against his chest and fired it. Mr. Daniels grabbed the gun and wrestled the Defendant over the gun while Mr. Marsh escaped through the front door. The Defendant shot Mr. Daniels in his side, and Mr. Daniels fell on his back. The Defendant stepped over Mr. Daniels and entered the living room. He then returned and shot Mr. Daniels several more times with a different gun. The Defendant stood at Mr. Daniels's feet and shot straight down at him. One shot hit Mr. Daniels's stomach; another shot grazed his upper chest; and one shot hit Mr. Daniels's spinal column, after which "everything just went kind of blank." Once Mr.

Daniels regained consciousness, he realized that a bullet had passed through his left shoulder blade. He was able to retrieve his cell phone and call 911. After he told the operator his address, he dropped his cell phone, and the battery fell out. He inserted the battery, and the operator called him back. By that time, Mr. Marsh had returned to the home and spoke to the 911 operator.

Mr. Daniels testified that he remained hospitalized for two months. He spoke to police officers while he was hospitalized, and on January 9, 2014, he identified the Defendant as the shooter in a photographic lineup. Mr. Daniels was shot six times and had multiple infections due to his injuries. His spleen, left kidney, fifteen feet of intestines, and half of his left lung had to be removed as a result of injuries sustained from the gunshots. He had a hole in his colon, as well as holes "in a bunch of other stuff," sustained multiple broken ribs, and had two bullets lodged in his spinal column. Because he was missing a large portion of his intestine, he was unable to properly absorb nutrients, and his teeth began decaying and falling out. All of his teeth had to be pulled as a result. On cross-examination, Mr. Daniels testified that Mr. Marsh's gun was still on his hip when Mr. Daniels saw the Defendant "rack" his gun upon reentering the home.

Mr. Marsh testified that on the day of the shooting, he and Mr. Coleman recorded a music video and returned to Mr. Marsh's home to edit the recording. Mr. Daniels, Mr. Carson, and the Defendant, whom Mr. Marsh had met on one prior occasion, were at the home. At one point, the Defendant said he was going outside and exited the home through the back door in the kitchen. At the same time, Mr. Marsh went into the kitchen to make a telephone call. Mr. Marsh stated that he saw the Defendant reenter the home and heard a gun "cock." The Defendant approached Mr. Marsh while holding a gun. Mr. Marsh tried to grab the Defendant's gun, but the Defendant was able to get away and pointed the gun at the back of Mr. Marsh's head.

Mr. Marsh testified that he had a gun on his hip and that the Defendant took the gun from him when the Defendant put his own gun to Mr. Marsh's head. Mr. Marsh put his hands up when he felt the gun on the back of his head. The Defendant pushed Mr. Marsh out of the kitchen and around a corner into the hallway. Mr. Marsh testified that he saw Mr. Daniels approach, heard a "pop" as Mr. Daniels was being shot, saw Mr. Daniels fall to the floor, and heard two or three more shots. Mr. Marsh then ran out of the home through the front door and hid near a tool shed.

Mr. Marsh testified that while hiding, he heard a series of gunshots fired outside the home, and that an SUV then sped away through the nearby alley. While returning home, Mr. Marsh saw Mr. Gaspar, his neighbor, lying on the ground while bleeding and moaning. Mr. Gaspar's wife and children were outside, and Mr. Marsh instructed them to call 911. Mr. Marsh entered his home and found Mr. Daniels lying in the same spot

where he had fallen earlier. Mr. Daniels appeared as if he was "almost dead." His cell phone was on his chest, and the 911 operator was on the line. Mr. Marsh took the cell phone and instructed the operator to send help quickly.

Mr. Marsh testified that he was not entirely truthful with police officers when he spoke to them following the shooting. He originally told officers that his gun was on a counter rather than on his hip. He explained that he was concerned about whether he could legally possess a gun and that he knew that a drug transaction was occurring in the home. He denied seeing marijuana in the home prior to the shooting.

On cross-examination, Mr. Marsh acknowledged that he had a "history with the legal system," which was a reason that he was afraid to tell officers that his gun was on his hip. He said the gun was a .45 caliber handgun, which held six rounds. He believed five or six rounds were in the gun. He denied previously selling drugs to the Defendant and said he met the Defendant through a friend of a friend. Mr. Marsh believed Mr. Carson had arranged the drug transaction. Mr. Marsh denied purchasing drugs from Mr. Carson or arranging drug transactions with Mr. Carson. Mr. Marsh also denied that the Defendant had called him for directions to the home. Mr. Marsh did not know Mr. Coleman's location at the time of trial and said Mr. Carson was deceased.

Mr. Gaspar testified through an interpreter that on the day of the shooting, he, his two daughters, his cousin, and his cousin's son arrived at Mr. Gaspar's home after playing basketball with friends. Mr. Gaspar drove to parking area behind his home and saw car parked behind his neighbor's home. The car drove away when Mr. Gaspar arrived. As Mr. Gaspar was backing his vehicle into his garage, a man came out of the home of Mr. Gaspar's neighbor and opened the door to Mr. Gaspar's vehicle. Mr. Gaspar testified that the man pulled out two guns from his pockets and ordered Mr. Gaspar to give him the keys to the car. When Mr. Gaspar asked "why," the man shot him twice. One bullet grazed Mr. Gaspar's body, and the other bullet entered his arm. Mr. Gaspar's cousin and the children were able to escape from the car and enter the home. Mr. Gaspar said that he "hit the guns" and that both guns fell, with one falling on the floor of the car next to the gas pedal. The man pulled Mr. Gaspar out of the car. The man fled in the car and drove over Mr. Gaspar's foot as he was escaping. Mr. Gaspar stated that a baby stroller and his daughters' two bicycles were in the car when the man drove away.

Mr. Gaspar remained hospitalized for three days. He underwent surgery during which screws were inserted in his arm, and his arm remained in a sling for one month. Due to his injury, he was unable to work following his release from the hospital. On cross-examination, Mr. Gaspar testified that the man fired both guns at him, that the man

- 4 -

seemed to be in a hurry to flee, and that the man did not look in Mr. Gaspar's car to see what was in it before driving away.

According to medical records from the University of Tennessee Medical Center, Mr. Gaspar was admitted on December 26 and was discharged on December 30, 2013. Mr. Daniels was admitted on December 26 and was discharged on January 24, 2014. Ms. Barbara Gentry, a trauma core nurse, testified that according to Mr. Daniels's records, he came to the emergency room suffering life-threatening injuries. His heart rate was extremely fast, and a nurse was unable to obtain a blood pressure reading from Mr. Daniels. The doctors chose to send Mr. Daniels directly to the operating room.

Investigator Michael Washam with the Knoxville Police Department testified that he and Investigator Colin McLeod responded to the scene. When they arrived, Mr. Daniels was being loaded into an ambulance, and Mr. Gaspar was being transported to the hospital. Investigator Washam stated that Mr. Daniels's injuries were so extensive that he was unsure that Mr. Daniels would survive. Investigator Washam and Investigator McLeod began identifying and interviewing potential witnesses, including Mr. Marsh and Mr. Coleman. As a result, the Defendant was developed as a suspect.

On the following day, officers located Mr. Gaspar's vehicle and transported it to a secure location for processing. Investigator Washam noted that blood was on the outside of the vehicle where Mr. Gaspar attempted to hang onto the vehicle and that blood also was along the side of the vehicle and on a wheel. Investigator Washam met with Mr. Marsh and had him retrace his steps. He also was able to speak with Mr. Daniels, who confirmed that the Defendant was a suspect. Mr. Daniels identified the Defendant as the shooter in a photographic lineup on January 9, 2014, and Mr. Marsh identified the Defendant as the shooter in a photographic lineup on January 26.

The Defendant was arrested on February 15, and Investigator Washam interviewed the Defendant, who waived his rights and agreed to speak to him. The Defendant stated that he had previously been involved in drug transactions with Mr. Marsh and Mr. Marsh's former girlfriend, "Goosie," who was in jail. The Defendant said that on the day of the shooting, he had arranged to purchase one pound of marijuana for approximately $2,000. He also said that he did not have the money and that he brought a gun, intending to rob the dealers of the marijuana.

Investigator Washam testified that Mr. Daniels had stated that he had provided directions for the Defendant and that he had observed a vehicle in which the Defendant appeared to have arrived parked near the home. Investigator Washam also had a description of the vehicle from multiple witnesses. The Defendant, however, told

- 5 -

officers that he walked to Mr. Marsh's residence. When officers confronted the Defendant with the inconsistency, he continued to maintain that he walked to the home.

The Defendant told officers that he entered the home through the back door and that he saw Mr. Daniels and Mr. Marsh in the living room and a man with dreadlocks on the computer. The Defendant stated that another man was supposed to deliver the marijuana and that they waited some time for the man, who arrived with a "Tupperware-type" container of marijuana. The Defendant said he needed to make a call, went outside, pulled out his gun, and reentered the home. Mr. Marsh was in the kitchen and saw the Defendant draw back the slide on his gun. The Defendant stated that Mr. Marsh went for a gun that was on his person and that the Defendant shot at Mr. Marsh. Although the Defendant did not know whether he hit Mr. Marsh, the Defendant said Mr. Marsh dropped his gun and moved. The Defendant stated that he pointed his gun at Mr. Marsh while retrieving Mr. Marsh's gun. The Defendant saw Mr. Daniels coming toward him and fired his gun twice at Mr. Daniels. Mr. Daniels fell, and Mr. Marsh ran out of the house.

The Defendant told officers that he walked into the living room and retrieved the container of marijuana. He said that as he was walking back through the home, Mr. Daniels made a movement on the floor, and the Defendant shot Mr. Daniels three more times with Mr. Marsh's gun, a Glock 36 .45-caliber handgun, while Mr. Daniels was lying on the floor. The Defendant then fled from the home.

The Defendant stated that he was in "panic mode" when he saw Mr. Gaspar in his vehicle. The Defendant approached the vehicle and ordered Mr. Gaspar to get out. The Defendant stated that Mr. Gaspar held onto the steering wheel and was "trying to beat on" the Defendant. The Defendant said initially he did not believe he shot Mr. Gaspar but later admitted that he "may have" shot Mr. Gaspar twice. The Defendant stated, "When I'm trying to get him out and I'm beating on him with the gun, yes, I ended up shooting him."

The Defendant did not recall throwing Mr. Marsh's gun from the vehicle and said he thought he took both guns with him when he drove away in Mr. Gaspar's vehicle. While fleeing at a high rate of speed, the Defendant crashed the vehicle and abandoned it at the location where officers later recovered it. The Defendant stated that he took both guns and threw them over a slope to the left of the vehicle. Investigator Washam stated that officers subsequently searched the wooded area where the Defendant said he discarded the guns, and the officers recovered a gun lying underneath some brush.

On cross-examination, Investigator Washam testified that the Defendant stated that he called Mr. Marsh to set up the drug transaction and that he called Mr. Daniels for

directions when he was near the home. The Defendant stated that he used his own gun to shoot Mr. Daniels initially, that Mr. Daniels continued to come toward him, and that he shot Mr. Daniels again. The Defendant maintained that he was in a state of "panic" because things were not going as he had hoped. He stated that when he first approached Mr. Gaspar's vehicle, another adult and children were also in the vehicle and that the adult and the children were able to escape from the vehicle. The Defendant admitted to fighting with Mr. Gaspar as Mr. Gaspar gripped the steering wheel and to striking Mr. Gaspar with a gun. Investigator Washam understood that once the Defendant got Mr. Gaspar out of the vehicle, Mr. Gaspar hung onto the vehicle for a short time before the Defendant drove away.

Officer Beth Goodman was an evidence technician for the Knoxville Police Department at the time of the shooting and responded to the scene. Upon entering the home, she observed an empty box for a Glock pistol on a coffee table in the living room. She also observed evidence of a shooting in the hallway between the living room and the kitchen. Articles of Mr. Daniels's clothing, which emergency personnel had cut off of him when rendering aid, and one of Mr. Daniels's shoes were on the floor in the hallway. Officer Goodman noted multiple blood stains and smears in the hallway, and she recovered a lock-blade knife near Mr. Daniels's shoe. Officer Goodman recovered six .45-caliber casings, three .380-caliber casings, and two bullets or fragments in the home. One bullet was recovered in the wall of the hallway near a baseboard, and another bullet was recovered in the living room. She noted multiple defects from bullets in the floor and baseboard in the hallway. One bullet traveled through the wall of the hallway, into a bedroom, and out of a window.

Officer Goodman went to the alley behind the home where she observed multiple blood stains, as well as clothing that was identified at trial as belonging to Mr. Gaspar. She recovered a pistol, two .380-caliber casings, and a plastic container with 27.26 grams of a green, leafy substance believed to be marijuana.

On cross-examination, Officer Goodman testified that four of the .45-caliber casings found in the home were Federal brand casings and that the other two .45-caliber casings were Remington Peters brand casings. The knife was open when Officer Goodman recovered it.

Officer Russell Whitfield, a member of the forensic unit of the Knoxville Police Department, went to the location where Mr. Gaspar's SUV was located. Officer Whitfield observed blood on the driver's side door, the floorboard, and a tire and its chrome. A child's car seat and bicycles were inside the vehicle. Officer Whitfield took photographs of the interior of the vehicle, which showed the bicycles on top of several items behind the passenger's seat and blocking the driver's view of the rear window.

Officer Whitfield later returned to the scene when officers recovered a Glock Model 36 .45-caliber handgun amongst thick brush at the bottom of a steep, wooded hill. He testified that the gun's slide was at the rear and that the chamber and the magazine were empty. On cross-examination, he testified that the gun was found "locked open," which indicated that someone had fired the gun until it was empty.

Mr. Keith Proctor with the DNA and serology section of the Tennessee Bureau of Investigation's crime laboratory in Knoxville was accepted by the trial court as an expert in DNA analysis. He testified that a swab from the driver's side door of the vehicle tested positive for blood and that the DNA profile obtained from the swab belonged to Mr. Gaspar. Mr. Proctor obtained a partial DNA profile of a mixture from at least two individuals from a swab of blood from the steering wheel. Mr. Gaspar was the major contributor at seven locations, and the remaining locations, as well as the minor contributor, were inconclusive due to insufficient or degraded DNA. Presumptive testing of a second swab of the steering wheel did not indicate the presence of blood. Mr. Proctor obtained a partial DNA profile from the swab that was consistent with a mixture of at least two individuals. The major contributors were consistent with a mixture of the DNA of the Defendant and Mr. Gaspar at five locations. The remaining locations were inconclusive due to insufficient or degraded DNA.

Ms. Patricia Resig, a firearms examiner with the Knoxville Police Department, was accepted by the trial court as an expert in firearms analysis. She testified that she examined a .380-caliber FEG semi-automatic pistol, a .45-auto caliber Model 36 Glock semi-automatic pistol, and the casings and bullets recovered at the scene. She determined that a .380-caliber bullet and three of the five .380-caliber casings were fired from the .380-caliber pistol. Ms. Resig stated that the other two .380-caliber casings displayed the same class characteristics and some of the same individual characters as the other fired casings but that she was unable to conclude with "100 percent certainty" that they were fired from the .380-caliber pistol. She said the two .380-caliber casings could have been fired from the .380-caliber pistol. She noted that of the six .45-caliber casings that she examined, two casings were Remington Peters brand casings and that two were Federal brand casings. She concluded that all six .45-caliber casings recovered were fired from the .45-caliber pistol. She stated that while a fired .45-caliber bullet was recovered, the bullet lacked sufficient matching individual characteristics to allow her to conclude that the bullet was fired from the .45-caliber pistol.

The Defendant testified in his own defense that he met Mr. Marsh and Mr. Daniels through Ms. Brittany Goosie, from whom the Defendant previously had purchased marijuana. The Defendant asked Ms. Goosie about purchasing "Molly," and Ms. Goosie introduced him to her boyfriend, Mr. Daniels. The Defendant said that he purchased

"Molly" from Mr. Daniels and that he purchased drugs from Mr. Marsh on two prior occasions.

The Defendant testified that on the day of the shooting, he called Mr. Marsh about purchasing drugs. Mr. Marsh told him that he was in Gatlinburg and that it would take some time to return home. After a few hours, the Defendant called Mr. Marsh for directions, and Mr. Marsh gave his cell phone to Mr. Daniels, who provided the Defendant with directions to the home. The Defendant stated that he walked to the home, entered through the back door, and sat on the couch in the living room. Mr. Marsh was not there when the Defendant arrived, and Mr. Marsh subsequently arrived with Mr. Coleman and a large amount of marijuana. The Defendant did not know Mr. Carson and believed Mr. Marsh had the marijuana.

The Defendant testified that he took a photograph of the marijuana and walked outside to call his brother about the marijuana. The Defendant stated that Mr. Marsh previously had "ripped him off," and the Defendant told his brother than he planned to get the money that Mr. Marsh owed him. When the Defendant reentered the home, Mr. Marsh was in the kitchen with a gun in his holster. The Defendant said that Mr. Marsh did not have the gun when he first entered the home and that Mr. Marsh must have "grabbed it when everything was going down." The Defendant stated that Mr. Marsh said he would not return the money and that Mr. Marsh put his hand on his gun. The Defendant also stated that Mr. Marsh touched his hip but did not pull out his gun. The Defendant said that he pulled out his gun because he was angry and that Mr. Marsh then pulled out his gun. The Defendant believed he fired his gun at Mr. Marsh, but he was not certain.

The Defendant testified that Mr. Marsh dropped his gun, and the Defendant grabbed it. The Defendant explained that it happened "really fast" and that he picked up Mr. Marsh's gun because he was scared and did not want Mr. Marsh to retrieve the gun. The Defendant maintained that he believed Mr. Marsh would shoot him if Mr. Marsh were able to retrieve his gun. The Defendant denied holding the gun to Mr. Marsh's head. Once the Defendant grabbed Mr. Marsh's gun, he turned around and saw Mr. Daniels running at him with a knife. The Defendant stated that he was afraid and believed he shot Mr. Daniels four or five times, but the Defendant also maintained that he was unsure the exact number of times that he initially shot Mr. Daniels. The Defendant said Mr. Daniels continued to run toward him, so he shot Mr. Daniels "a couple more times," after which Mr. Daniels fell. The Defendant stated that he was "freaking out," saw Mr. Daniels reaching for something, and shot him once more. The Defendant ran into the living room, grabbed the marijuana, and ran out of the back door. He stated that approximately three minutes had passed between Mr. Marsh's arrival and the shooting and that the shooting continued for less than two minutes.

The Defendant testified that after running out of the home, he approached Mr. Gaspar and "upped the gun on him." The Defendant explained that he was trying to take Mr. Gaspar's vehicle because he was afraid and was "really freaking out." The Defendant maintained that he did not know that children were in the vehicle because the windows were tinted. When the Defendant confronted Mr. Gaspar, Mr. Gaspar tried to grab the Defendant's arm; the Defendant shot him; Mr. Gaspar did not let go; and the Defendant shot him again. The Defendant dropped the gun; Mr. Gaspar got out of the vehicle; and the Defendant drove away. The Defendant stated that the encounter with Mr. Gaspar lasted forty-five seconds to one minute. While fleeing, the Defendant crashed the vehicle and abandoned the vehicle on a dead end street.

On cross-examination, the Defendant testified that he had purchased marijuana from Ms. Goosie on three or four occasions, that Ms. Goosie has "shorted" him marijuana on one occasion, and that Mr. Marsh and Ms. Goosie were working together. The Defendant said Mr. Marsh contacted him on Facebook, stated that Ms. Goosie was in jail, and asked the Defendant to help "move" marijuana for him. The Defendant said he planned to ask Mr. Marsh for the "shorted" marijuana because the Defendant believed the purpose of the drug transaction was to help Ms. Goosie.

The Defendant agreed that he did not intend to purchase marijuana and that his plan was to rob the victims of marijuana. He agreed that he called Mr. Marsh under the guise of purchasing marijuana and that he told Mr. Marsh that he would purchase two pounds for $6,800. The Defendant brought money and a gun for "protection." He did not have a handgun permit and maintained that he obtained the gun from a friend and did not know it was loaded. He also maintained that he was not planning to shoot anyone and that he did not know that guns were in the home until he saw Mr. Marsh with one. The Defendant testified that Mr. Marsh did not reach for his gun but grabbed his hip, which the Defendant understood to be a threat. The Defendant then pulled out his gun. He did not know where he shot Mr. Daniels and denied returning from the living room to shoot him again. The Defendant said that during the shooting, one of the men who fled took two pounds of marijuana with him. The Defendant took the marijuana that remained in the living room.

The Defendant testified that he was holding one gun in one hand and the marijuana in his other hand when he confronted Mr. Gaspar. The other gun was in the Defendant's pocket. The Defendant stated that while struggling with Mr. Gaspar over the gun, the gun fired twice, that Mr. Gaspar opened the door and got out, and that the Defendant then entered the vehicle. The Defendant maintained that he did not look inside the vehicle and did not know that what items were inside. He acknowledged that he threw a gun into the woods.

- 10 -

On redirect examination, the Defendant testified that he always had a gun whenever he was involved in a drug transaction. He stated that he had cash with him at the time of the shooting and that he likely would have purchased more drugs had the victims given him the drugs that he had been "shorted." The Defendant maintained that he picked up Mr. Marsh's gun before Mr. Marsh could do so. The Defendant also maintained that he did not intend to kill Mr. Daniels and that every time he shot Mr. Daniels, he believed Mr. Daniels was coming at him or was otherwise a threat.

The Defendant testified that he did not purposely try to shoot Mr. Gaspar. The Defendant stated that as he was trying to get into the vehicle, Mr. Gaspar reached for the gun, that the gun was fired during the struggle, that Mr. Gaspar would not let go of the gun, and that the Defendant shot him again. The Defendant maintained that he did not know the bicycles were in the vehicle when he drove away.

The Defendant was charged with two counts of especially aggravated kidnapping of Mr. Marsh, two counts of aggravated robbery of Mr. Marsh, two counts of attempted first degree murder of Mr. Daniels, two counts of employing a firearm during the commission of a dangerous felony, two counts of carjacking, two counts of employing a firearm during the commission of a dangerous felony, to-wit: carjacking, and two counts of especially aggravated robbery of Mr. Gaspar. The jury acquitted the Defendant of two counts of especially aggravated kidnapping and convicted him of the remaining charges.

**Sentencing Hearing**

During the sentencing hearing, the State entered the Defendant's presentence report into evidence. The presentence report reflected that the twenty-three-year-old Defendant had prior convictions for traffic-related offenses and possession of drug paraphernalia, as well as multiple juvenile offenses. He also had pending charges for assault and drug offenses. He admitted to using marijuana, Xanax, and hydrocodone on a daily basis, "MDMA" multiple times a week, and mushrooms once every two months. He had no history of employment. The presentence report stated that according to a mental health assessment report dated after the offenses and prior to trial, the Defendant was diagnosed with antisocial personality disorder, severe cannabis use disorder, severe opioid use disorder, severe sedative, hypnotic, and anxiolytic use disorder, and moderate alcohol use disorder.

Mr. Daniels's sister read Mr. Daniels's impact statement to the trial court. In the statement, Mr. Daniels recalled the feeling of "terror and helplessness" when the Defendant attacked him. Mr. Daniels described his injuries, the pain as a result of the injuries, his months in the hospital, and his numerous surgeries. He stated that he

continued to suffer night terrors, was unable to work due to his injuries, and had to depend on his family for financial support. Mr. Daniels's sister also provided a victim impact statement in which she detailed the stress and pressure that has affected her family since the shooting. Mr. Gaspar gave an impact statement through an interpreter in which he said he was unable to work on a daily basis since the shooting and that his family has suffered financially as a result.

The trial court took that matter under advisement and subsequently entered an order and a corrected order in which it applied four enhancement factors and found that no mitigating factors applied. In imposing consecutive sentences, the trial court found that the Defendant is a "professional criminal who has knowingly devoted [his] life to criminal acts as a major source of livelihood." T.C.A. § 40-35-115(b)(1). The trial court stated that the Defendant was twenty-three or twenty-four years old, did not have an employment history, and had testified that he used and sold drugs. The trial court found that this evidence established that "to the extent the defendant has made a living, he has done so by committing crimes."

The trial court also found that the Defendant was a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). The trial court stated that the circumstances surrounding the commission of the offenses were aggravated. The trial court noted that the Defendant had a loaded handgun and approached Mr. Gaspar, who was in his vehicle with his two young children and his brother; that the Defendant reached into the vehicle and struggled with Mr. Gaspar while trying to pull him out of the car; and that the gun could have easily discharged during the struggle, wounding or killing Mr. Gaspar's children, his brother, a neighbor, or a passerby. The trial court stated that these circumstances, along with the magnitude and severity of the injuries to Mr. Daniels and Mr. Gaspar, supported a finding that the circumstances were aggravated. The trial court found that confinement for an extended period of time was necessary to protect society from "the defendant's unwillingness to lead a productive life and the defendant's resort to criminal activity in furtherance of an antisocial lifestyle." The trial court noted that according to the presentence report, the Defendant had been diagnosed with antisocial personality disorder, severe cannabis use disorder, severe opioid use disorder, and substance abuse psychotic disorder. The trial court found that these factors, along with the Defendant's "only means of making a living," justify "a very long period of protection for the community." Finally, the trial court found that the aggregate length of the sentences reasonably related to the facts and circumstances of the offenses for which the Defendant was convicted. The trial court stated that the Defendant's convictions for attempted first degree murder and especially aggravated robbery were among the most serious crimes in Tennessee and that the Defendant's action resulted in two victims suffering serious and permanent injuries.

While the trial court imposed individual sentences for each conviction, the trial court also merged the two aggravated robbery convictions, the two convictions for attempted first degree murder, the two convictions for employing a firearm during the commission of a dangerous felony, the two convictions for employing a firearm during the commission of a dangerous felony to wit: carjacking, the two carjacking convictions, and the two especially aggravated robbery convictions. In imposing an effective sixty-eight-year sentence and after merging the various convictions, the Defendant's sentences are as follows:

| Count | Conviction | Sentence |
|---|---|---|
| 3 | Aggravated Robbery | 12 years at 85% |
| 6 | Attempted First Degree Murder | 25 years at 85%, consecutive to Count 3 |
| 8 | Employment of a Firearm During the Commission of a Dangerous Felony | 6 years at 100%, consecutive to Count 6 |
| 9 | Carjacking | 12 years at 30%, concurrent with Count 13 |
| 12 | Employment of a Firearm During the Commission of a Dangerous Felony to Wit: Carjacking | 6 years at 100%, consecutive to Count 9 and concurrent with Count 13 |
| 13 | Especially Aggravated Robbery | 25 years at 100%, consecutive to Count 8 |

The Defendant filed a motion for new trial and an amended motion, which the trial court denied following a hearing. He then filed a notice of appeal.

## ANALYSIS

### I. Sufficiency

Although the Defendant lists as an issue in his brief the sufficiency of the evidence related to all of his convictions, his two-page argument regarding sufficiency only challenges his convictions for attempted first degree murder, carjacking, and especially aggravated robbery. Thus, our review is limited to these convictions.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal,

"'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

## A. Attempted First Degree Murder

We note that the Defendant was charged with and convicted of one count of attempted first degree murder of Mr. Daniels and one count of attempted first degree murder of Mr. Daniels which resulted in serious bodily injury. As it relates to this case, first degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). Tennessee Code Annotated section 39-12-101 delineates the requirements for a conviction for criminal attempt:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the

- 14 -

conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

If a defendant is found guilty of attempted first degree murder "where the victim suffers serious bodily injury," the defendant is not eligible for release until he serves eighty-five percent of his sentence. T.C.A. § 40-35-501(k)(5).

The Defendant maintains that the evidence insufficient to establish intent or premeditation as to support his convictions for attempted first degree murder. A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* The statute also specifies that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence which could lead a rational trier of fact to infer that premeditation was established by the proof as required by statute. *Id.* at 615. Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013). Factors which tend to support the existence of premeditation include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; and preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id.* Repeated blows, although not alone sufficient to establish premeditation, may be a relevant factor in determining the existence of premeditation. *Id.* Mutilation of the body may show that a killing was not rash or impulsive. *Davidson*, 121 S.W.3d at 616. Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)). "Under *Bland*, shooting a retreating victim alone provides circumstantial evidence of premeditation." *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013).

The evidence, when viewed in a light most favorable to the State, established that the Defendant went to the home of Mr. Daniels and Mr. Marsh under the guise of purchasing marijuana. The Defendant acknowledged that he intended to rob them of the drugs. Once the drugs were produced, the Defendant walked outside and returned with a gun, which he immediately "rack[ed]" or "cock[ed]." He put the gun to Mr. Marsh's head and took Mr. Marsh's gun off his person. In an effort to save Mr. Marsh, Mr. Daniels went down the hallway with a knife. However, when Mr. Daniels saw the Defendant holding a gun to Mr. Marsh's head, Mr. Daniels dropped the knife and put his hands up. Although Mr. Daniels no longer had a weapon and put his hands up to establish that he would not engage the Defendant, the Defendant shot him multiple times. The Defendant retrieved the drugs from the living room, returned to the hallway, and shot Mr. Daniels numerous additional times while standing over Mr. Daniels, as Mr. Daniels was injured and lying on the floor. The Defendant shot Mr. Daniels with both the Defendant's .380-caliber gun and Mr. Marsh's .45-caliber gun, and the evidence established that the Defendant shot Mr. Marsh's gun until it ran out of bullets. Mr. Daniels sustained numerous serious injuries as a result. Rather than render aid, the Defendant fled the scene in a vehicle that he took from Mr. Gaspar after shooting him twice. The Defendant crashed the vehicle, discarded his gun, and fled. We conclude that this evidence is sufficient to establish premeditation and intent so as to sustain a conviction for attempted first degree murder of Mr. Daniels.

## B. Carjacking and Especially Aggravated Robbery

The Defendant contends that the evidence is insufficient to sustain his convictions for carjacking and especially aggravated robbery. He specifically maintains that the evidence only suggests that he took Mr. Gaspar's vehicle to expedite the Defendant's flight from the scene and that the evidence fails to establish that the Defendant took the vehicle with the intent to deprive Mr. Gaspar of the vehicle or its contents.

The Defendant was charged with and convicted of one count of carjacking through the use of force and one count of carjacking through the use of intimidation. Carjacking, as it relates to the present case, is "the intentional or knowing taking of a motor vehicle from the possession of another by use of … [f]orce or intimidation." T.C.A. § 39-13-404(a)(2). Although the Defendant contends that the evidence fails to establish that he took the vehicle with the intent to deprive Mr. Gaspar of the vehicle, our supreme court has recognized the carjacking statute "only requires proof that the defendant took a motor vehicle from the possession of another" and does not require "proof that the defendant took the vehicle with an intent to deprive the owner of the property." *State v. Wilson*, 211 S.W.3d 714, 722 (Tenn. 2007). "Under our statutory definition of carjacking, the motive

for the taking is irrelevant, and therefore carjacking prosecutions do not include the burden of proving an intent to deprive the victim of the vehicle." *Id.* at 722.

Rather, the evidence, when viewed in a light most favorable to the State, established that the Defendant was armed and ordered Mr. Gaspar out of the vehicle. When Mr. Gaspar resisted, the Defendant shot him twice, removed him from the vehicle, and drove away in the vehicle, running over Mr. Gaspar's foot in the process. We conclude that this evidence is sufficient to support the Defendant's convictions for carjacking through the use of force and carjacking through the use of intimidation.

Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. T.C.A. § 39-13-403(a). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). "A robbery can involve the taking of property from the physical body of a person, in which a person has actual possession of the property, or from a person's immediate presence or the general area in which the victim is located, in which the person has constructive possession of the property." *State v. Tolbert*, 507 S.W.3d 197, 217 (Tenn. Crim. App. 2016) (citations omitted); *see State v. Edmondson*, 231 S.W.3d 925, 928 (Tenn. 2007) ("The words 'from the person of another' indicate that the property is in close physical proximity to the victim when the property is taken.").

The Defendant was convicted of one count of especially aggravated robbery through violence and one count of especially aggravated robbery by putting Mr. Gaspar in fear. The indictment lists the items taken as a baby stroller, bicycles, the vehicle registration, and CDs. However, at trial the State sought convictions for especially aggravated robbery of the bicycles in Mr. Gaspar's vehicle. The Defendant does not contest the fact that Mr. Gaspar suffered serious bodily injury or that the taking was accomplished through violence or by putting Mr. Gaspar in fear. Rather, the Defendant maintains that the evidence only establish that he took Mr. Gaspar's vehicle as a mean to expedite his escape and that he did not take the vehicle with the intent to deprive Mr. Gaspar of the vehicle's contents.

An owner is deprived of property when a defendant "[w]ithhold[s] property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner"; "[w]ithhold[s] property or cause[s] it to be withheld for the purpose of restoring it only upon payment of a reward or other compensation"; or "[d]ispose[s] of property or use[s] it or transfer[s] any interest in it under circumstances that make it restoration unlikely." T.C.A. § 39-11-106(9). "The

- 17 -

intent to deprive may be based solely upon circumstantial evidence, and a 'jury may infer a … defendant's intent from the surrounding facts and circumstances.'" *State v. Germaine Markques Long*, No. W2018-01203-CCA-R3-CD, 2019 WL 1450405, at *2 (Tenn. Crim. App. Mar. 29, 2019), *no perm. app. filed* (quoting *State v. Roberts*, 93 S.W.2d 403, 410 (Tenn. Crim. App. 1996), *overruled on other grounds by State v. Ralph*, 6 S.W.3d 251 (Tenn. 1999)).

When viewed in a light most favorable to the State, the evidence presented at trial established that the Defendant approached Mr. Gaspar while armed and demanded his vehicle. Two bicycles were located inside the vehicle in the back and blocking the driver's view of the rear window, and, thus, they were in clear view of the driver. Although the Defendant does not contend in his brief that he was unaware that the bicycles were in the vehicle when he drove away, we note that the jury could infer based upon the size and location of the bicycles that the Defendant knew the bicycles were in the vehicle when he drove away in the vehicle. The Defendant shot Mr. Gaspar twice, drove away in the vehicle with the bicycles inside, crashed the vehicle, and then abandoned it. We conclude that this evidence is sufficient to establish that the Defendant obtained the bicycles with the intent to deprive Mr. Gaspar of them. The Defendant is not entitled to relief on this issue.

## II. Sentencing

The Defendant does not challenge the trial court's application of enhancement factors or the individual sentences for each conviction. Rather, he contends that the trial court erred in imposing partial consecutive sentences, arguing that his total effective sentence is excessive and violates the principles of sentencing. The State responds that the trial court properly exercised its discretion in imposing partial consecutive sentences. We agree with the State.

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). This court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. The decision to impose consecutive sentences rests within the sound discretion of the trial court. *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010). The standard

of review for consecutive sentencing is abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862. The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

To impose consecutive sentencing, the trial court must find by a preponderance of the evidence at least one of seven factors listed in Tennessee Code Annotated section 40-35-115(b), which includes: (1) "The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood" and (4) "The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" The Defendant does not challenge the trial court's application of these two factors. Rather, he asserts that his effective sentence of sixty-eight years after the imposition of partial consecutive sentences is excessive and "violates the principle that the total sentence should be the least severe measure necessary." However, the trial court made extensive findings in sentencing the Defendant. The trial court considered the principles of sentencing and found that the aggregate length of the sentence reasonably related to the facts and circumstances of the offenses for which the Defendant was convicted. Accordingly, we conclude that the trial court did not abuse its discretion in imposing partial consecutive sentences.

## CONCLUSION

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE